UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

ESTATE OF WILLIAM R. CAPE,
JENNIFER L. FELDMAN,

               Plaintiffs,

            v.                                 Case No.  11-C-0357

UNITED STATES OF AMERICA,

               Defendant.

## DECISION GRANTING THE UNITED STATES' MOTION
## FOR SUMMARY JUDGMENT (DOC. 70) AND DENYING PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT (DOC. 61) AND ORDER DISMISSING CASE

     The plaintiffs sue the United States for a refund of income taxes they allege were erroneously assessed and collected for three tax years. The taxpayer, William R. Cape ("William Cape"), passed away in 2002, and the refund claims are pressed by his estate and his widow, Jennifer Cape, now known as Jennifer Feldman ("Feldman"). Initially, the complaint asserted entitlement to refunds based on amounts that a now-defunct S corporation, James Cape & Sons Company ("Cape & Sons"), allegedly passed through to owner William Cape and various computational errors in the returns William Cape filed with the Internal Revenue Service ("IRS"). The "pass-through claims adjustments" were based on claimed overstatement of taxable income by Cape & Sons, which then were reported as pass-through income by William Cape in 2001 and 2002. (Doc. 1, ¶ 31.) The "computational adjustments" were said to "flow[] automatically from the proper application of the Code to the 1999, 2001 and 20002 taxable years." (*Id.*) The parties stipulated to dismissal of the pass-through adjustments and most of the computational adjustments.

What remains are claims made on only three claimed computational errors as described below.

The parties have filed cross-motions for summary judgment. Many of the pertinent facts were submitted as stipulations, though each side submitted one or more additional proposed findings of fact for the court's consideration. At the heart of the case is whether the records plaintiffs have presented to the IRS and this court are sufficient to substantiate their claims for a refund. William Cape is deceased, Cape & Sons went into receivership in 2005, another S corporation called Curkeet Services, Inc. ("Curkeet") is dissolved, the accounting company that prepared Cape's taxes (Arthur Andersen LLP) has gone out of business, and many years have passed, complicating plaintiffs' task.

Summary judgment is proper if the depositions, documents or electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials show that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-

2

48.  "Material" means that the factual dispute must be outcome-determinative under governing law.  *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).  Failure to support any essential element of a claim renders all other facts immaterial.  *Celotex*, 477 U.S. at 323.  To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249.

Even though the parties in this case have filed cross-motions for summary judgment and many stipulated facts, each side still bears the burden of showing that no genuine issues of material fact exist, taking the facts in the light most favorable to the opposing party.  That both parties have moved for summary judgment does not establish that a trial is unnecessary.  See 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 at 327-28 (3d ed. 1998).  Failure of one party to satisfy that burden on its motion does not automatically indicate that the opposing party has satisfied its burden on the other motion.  *See id.*

## CHALLENGES TO EVIDENCE

Before setting forth the pertinent facts of the case, the court must address the government's challenge to two declarations submitted by plaintiffs.  The United States contends that the declarations fail the requirements of Fed. R. Civ. P. 56(c)(4), which include that a declaration filed in support of a motion for summary judgment be made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated.

The declaration of William Walther fails these requirements.  Walther states that he was employed by Cape & Sons as the comptroller/vice-president of finance from the fall

3

of 2001 until early 2005. (Doc. 64, ¶ 2.) He then attests to the percentage ownership of a different corporation, Curkeet, and states that accounting and financial information regarding Cape & Sons was properly reflected on the federal income tax returns of Curkeet; that attached documents were copies of Curkeet's taxes for 1999, 2000, and 2001; that amounts reported on certain lines of Curkeet's returns accurately reflected the rental of equipment by Curkeet to Cape & Sons; and that the accounting and financial information that served as the basis for the Curkeet returns "would have been maintained in a manner adequate to substantiate the amounts reported on the Curkeet Returns." (Doc. 64, ¶¶ 4-9.) Most of these declarations are made to "the best of [Walther's] knowledge and belief." (Doc. 64, ¶¶ 4, 6, 8, 9.) Declaring that a person believes something or knows something to the best of one's knowledge is not equivalent to saying the person has personal knowledge.

Beyond the insufficient language of "best knowledge" and "belief," Walther fails to state how he knows anything about Curkeet. Walther worked at Cape & Sons, not Curkeet. He states vaguely that in his capacity as an employee at Cape & Sons he was "familiar" with Curkeet, which provided payroll services and equipment rentals to Cape & Sons. (Doc. 64, ¶ 3.) Nothing indicates how Walther's familiarity with Curkeet's provision of payroll services and equipment rentals makes him competent to testify to Curkeet's ownership, the validity and accuracy of Curkeet's tax returns, and the maintenance of Curkeet's financial records. Thus, the court will disregard Walther's declaration in its entirety. Any proposed findings of fact relying solely on Walther's declaration will be disregarded as well.

4

Scott Harmsen declares that from September 1, 1998, to June 2, 2002, he was a partner at Arthur Andersen at its Milwaukee office and was familiar with tax return preparation procedures of Arthur Andersen's Milwaukee office. (Doc. 65, ¶ 2.) Harmsen avers that as an Arthur Andersen employee he "participated" in the preparation of the federal income tax returns for William Cape for calendar tax years 1996 through 2001, and recognizes his signature on William Cape's returns as preparer for taxable years 1996, 1997, and 2001. (Doc. 65, ¶¶ 3-6.) He states that "[i]n preparing tax returns, it was the practice of the Milwaukee Office to gather information from the taxpayer and reflect such information on the tax return, and to the best of [his] knowledge and belief, the Tax Returns were prepared in accordance with this process." (Doc. 65, ¶ 7.) Harmsen adds that as the signer of the 1996, 1997, and 2001 returns he was responsible for supervising the "above-described process with respect to such returns, and, to the best of [his] knowledge and belief, such returns were prepared in accordance with the process set forth above." (Doc. 65, ¶ 8.)

Harmsen's sworn statement establishes that he has some personal knowledge concerning Arthur Andersen's Milwaukee office, the preparation of William Cape's tax returns from 1996 through 2001, and the signature on William Cape's tax returns for three of those years. Thus, his declaration will be considered in part. However, certain declarations by Harmsen do not get plaintiffs very far. For instance, that the practice of Arthur Andersen's Milwaukee office was to gather information from a taxpayer and to reflect such information on a tax return does nothing to support the accuracy of William Cape's financial records or tax returns. Harmsen calls this vague practice a "process" but provides no detail that verifies any information in William Cape's returns. His declaration

5

lacks any indication of personal knowledge of the return as a whole or particular items in William Cape's tax returns or K-1s, especially for tax years during which he did not sign the returns. Additionally, Harmsen's statement that "to the best of [his] knowledge and belief" William Cape's taxes were prepared in accord with this vague process is inadequate for the reasons discussed above regarding Walther's statements. Hence, Harmsen's statements made to the best of his knowledge and belief will be disregarded, and the balance cited by plaintiff will be considered with a critical eye.

In addition to challenging the Walther and Harmsen declarations, the United States challenges plaintiffs' use of various documents for the truth of the matters asserted in them. Plaintiffs rely predominantly on tax returns, Schedule K-1s, and documents from the files of William Cape and their accountants to support their claim for refund. While the documents may be used as evidence of what is written on them, they cannot be used for the truth of the matters asserted in them. For instance, that a K-1 from Cape & Sons to William Cape shows a charitable donation amount cannot be used to prove that Cape & Sons actually made a charitable donation. The tax forms and schedules presented to this court are not attested to by a custodian or other qualified witness who can state that the records were made by someone with knowledge of underlying, supporting material. Further, that the 2003 audit uncovered errors in some of the returns at issue suggests a lack of trustworthiness regarding the prior filings. *See* Fed. R. Evid. 803(6). The court has tried to adjust the plaintiffs' proposed findings of fact as necessary to reflect the difference between what a particular document states and the truth of what a particular document states. This problem is addressed elsewhere below.

6

Finally, the court notes plaintiffs' argument that tax returns and other records retrieved from Baker Tilly Virchow Krause, LLP meet the business records exceptions for hearsay, Fed. R. Evid 803(6), or the residual hearsay exceptions rule, Fed. R. Evid. 807. That William Cape's, Cape & Sons', and Curkeet's records were within Baker Tilly's files does not make them business records of Baker Tilly for purposes of Rule 803(6). Nor should the residual exception be used to cure the failure to meet the specific requirements in Rule 803(6).

UNDISPUTED FACTS

The Estate of William R. Cape (the "Estate") is a probate estate for William Cape, who died on August 3, 2002. The Estate was opened in Racine County, Wisconsin, on or about September 20, 2002. (Doc. 58, ¶¶ 1, 2.[1])

From January 1, 1998, through August 3, 2002, Cape & Sons elected to be taxed as an S corporation under the Internal Revenue Code of 1986, as amended. (Doc. 58, ¶ 39.) For the 1998 calendar year, William Cape's ownership percentage in Cape & Sons for purposes of allocating pass-through items from Cape & Sons was 43.306075%. (Doc. 58, ¶ 41.) For the 2000 calendar year, William Cape's ownership percentage in Cape & Sons for purposes of allocating pass-through items from Cape & Sons was 43.551325%. (Doc. 58, ¶ 44.)

Curkeet, a Wisconsin corporation, was incorporated on or about March 1, 1992. (Doc. 58, ¶ 49.) From March 1, 1992 through August 3, 2002, Curkeet elected to be taxed

---

[1]Document 58 in the docket is the parties' stipulated set of facts.

7

as an S corporation under the Code. (Doc. 58, ¶ 50.) William Cape owned 50% of the outstanding stock of Curkeet from January 1, 1999, until his death. (Doc. 58, ¶ 52.)

William Cape was married to Elizabeth A. Cape ("Elizabeth Cape") until her death in 1996. (*See* Doc. 58, ¶¶ 4, 5.) On or about July 15, 1997, William Cape filed a joint individual federal income tax return for his deceased wife and himself for the 1996 calendar year (the "1996 return"). (Doc. 58, ¶ 4.) There was no total tax reported as due on the 1996 return. (Doc. 58, ¶ 7.) An Account Transcript for William Cape and Elizabeth Cape from the IRS dated May 4, 2009, shows a $0 balance due for the 1996 calendar year. (*See* Doc. 58, ¶ 8.)

On or about April 15, 1998, William Cape filed an individual federal income tax return for the 1997 calendar year (the "1997 return"). (Doc. 58, ¶ 9.) The total tax reported due on the 1997 return, $119,329, was paid in full. (Doc. 58, ¶ 11.) An Account Transcript for William Cape from the IRS dated May 4, 2009, shows a $0 balance due for the 1997 calendar year. (Doc. 58, ¶ 12.)

On or about June 13, 1999, William Cape filed an individual federal income tax return for the 1998 calendar year (the "1998 return"). (Doc. 58, ¶ 13.) The total tax reported due on the 1998 return, $24, was paid in full. (Doc. 58, ¶ 15.) No charitable deduction claim appears on William Cape's 1998 tax return. (Doc. 63, ¶ 22; Doc. 72, ¶ 22; Doc. 58, Ex. E at CAPEUSA000053 (line 18).) The 1998 return shows that charitable contributions, including a contribution of $1075 to "St. Luke's" and contributions from K-1's, were "Reduced by AGI limitation" of negative $4588, equal to the amount of the contributions. (Doc. 63, ¶ 25; Doc. 72, ¶ 25; Doc. 58, Ex. E at CAPEUSA000080.)

8

It appears that William Cape married Feldman during 1999. (*See* Doc. 58, ¶¶ 3, 16, 31.)  On or about April 17, 2000, William Cape and Feldman filed a joint individual federal income tax return for the 1999 calendar year (the "1999 return").  (Doc. 58, ¶ 16.)  The total tax reported due on the 1999 return, $161,913, was paid in full.  (Doc. 58, ¶ 18.)  An Account Transcript for William Cape and Feldman from the IRS, dated May 4, 2009, shows a $0 balance due for the 1999 calendar year.  (Doc. 58, ¶ 19.)

On or about June 30, 2001, William Cape and Feldman filed a joint individual federal income tax return for the 2000 calendar year (the "2000 return").  (Doc. 58, ¶ 22.)  The total tax reported due on the 2000 return, $16, was paid in full.  (Doc. 58, ¶ 24.)  An Account Transcript for William Cape and Feldman from the IRS, dated May 4, 2009, shows a $0 balance due for the 2000 calendar year.  (Doc. 58, ¶ 25.)

On or about April 15, 2002, William Cape and Feldman filed a joint individual federal income tax return for the 2001 calendar year (the "2001 return").  (Doc. 58, ¶ 26.)  The total tax reported due on the 2001 return, $134,295, was paid in full.  (Doc. 58, ¶ 28.)  An Account Transcript for William Cape and Feldman from the IRS, dated May 4, 2009, shows a $0 balance due for the 2001 calendar year.  (Doc. 58, ¶ 29.)

The 1996 return, the 1997 return, the 1998 return, the 1999 return, the 2000 return and the 2001 return (together, the "96-01 returns") were prepared by Arthur Andersen LLP. (Doc. 58, ¶ 30.)

William Cape died in 2002.  (*See* Doc. 58, ¶¶ 2, 31.)  On or about October 15, 2003, Feldman filed a joint individual federal income tax return for her deceased spouse and herself for the 2002 calendar year (the "2002 return").  (Doc. 58, ¶ 31.)  The total tax

9

reported due on the 2002 Return, $76,371, was paid in full.  (Doc. 58, ¶ 34.)  The 2002 Return was prepared by Berkley & Iselin, S.C.  (Doc. 58, ¶ 33.)

Subsequently, the IRS audited the 1999 return, the 2000 return, and the 2001 return (the "2003 audit").  (Doc. 58, ¶ 35.)  Pursuant to the 2003 audit, the IRS prepared a Form 4549, Income Tax Examination Changes, dated October 15, 2003 (the "2003 Form 4549"), reflecting changes to the income and/or alternative minimum taxes ("AMT") owed on the 1999 return, the 2000 return, and the 2001 return.  (Doc. 58, ¶ 36.)  The 2003 Form 4549 included adjustments to income attributable to an audit of Cape & Sons for the 1999, 2000, and 2001 calendar years and adjustments to William Cape and Feldman's individual Form 1040 tax returns for those calendar years.  (Doc. 58, ¶ 47.)  The plaintiffs fully paid the additional tax, interest and penalties assessed to William Cape and Feldman pursuant to the 2003 audit.  (Doc. 58, ¶ 38.)

Regarding the 1999 return, the 2003 Form 4549 shows a flow-through adjustment from Cape & Sons' Form 1120S in an amount of $152,009.  (Doc. 72, ¶ 21; Doc. 58, Ex. N at CAPEUSA000001; *see* Doc. 63, ¶ 21.)  The 2003 Form 4549 shows a deficiency in tax of $61,135 for the 1999 tax year.  (Doc. 58, Ex. N at CAPEUSA000001.)

The 2000 return had deducted $7279 of charitable donations attributable to the 2000 calendar year, including William Cape's share of the charitable donations made by Cape & Sons in the 2000 calendar year.  (Doc. 58, ¶ 45.)  Pursuant to the 2003 audit, William Cape and Jennifer Feldman's adjusted gross income as reported on the 2000 return was reduced, resulting in the disallowance of the $7279 of charitable deductions. (Doc. 58, ¶ 46; Doc. 72, ¶ 33; Doc. 58, Ex. N at CAPEUSA000008 (line 9); *see* Doc. 63, ¶ 33.)

10

Plaintiffs timely filed a Protective Claim for Refund for the taxable years 1999, 2000, and 2001 with the Internal Revenue Service Center in Kansas City, Missouri, on or about April 14, 2005.  (Doc. 58, ¶ 71.)  Moreover, they timely filed a Protective Claim for Refund for the 2002 taxable year on or about April 14, 2006 (together, the "Refund Claims").  (Doc. 58, ¶ 72.)  Notes made by an IRS Appeals Officer assigned to the Refund Claims stated that "One small item for contribution carryover of <7279> (see item g on 2-9-09 schedule submitted by rep.) s/b allowed."  (Doc. 58, ¶ 48.)

During the period in which the 96-01 returns were prepared, Harmsen worked for Arthur Andersen primarily out of its office in Milwaukee, Wisconsin.  (Doc. 63, ¶ 1; Doc. 72, ¶ 1.)  Harmsen, as an employee and then as a partner of Arthur Andersen, participated in the preparation of the 96-01 returns, and signed William Cape's 1996, 1997 and 2001 tax returns as the tax return preparer.  (Doc. 63, ¶ 1; Doc. 72, ¶ 2.)  In preparing tax returns, it was the practice of Arthur Andersen's Milwaukee office "to gather information from the taxpayer and reflect such information on the tax return."  (Doc. 65, ¶ 7.[2])

Tax records from Arthur Andersen relating to William Cape's tax returns were organized by calendar year.  (*See* Doc. 63, ¶ 4; Doc. 72, ¶ 4.)  Materials for William Cape's 1998 tax return begin with a cover page entitled "William Cape 1998 Tax Return," and include an instruction sheet regarding filing, versions of Cape's tax returns (signed by an Arthur Andersen representative but not William Cape) and various other materials related to William Cape's 1998 federal and state tax income tax returns.  (Doc. 63, ¶ 5; Doc. 72, ¶ 5; Doc. 67, Ex. B.)  Arthur Andersen's 1998 tax records for William Cape include a

---

[2]As stated above, Harmsen offers no further information about this "process" of gathering information or reflection of information on tax returns.  (*See* Doc. 65.)

document entitled "IRS Tax Receipt," addressed to William Cape indicating charitable contributions of $1075 during 1998 to St. Luke's Episcopal Church and stating "This is an official receipt for IRS purposes" and that "[n]o goods or services were provided in exchange for money given." (Doc. 63, ¶ 9; Doc. 72, ¶ 9; Doc. 58, Ex. P.) The 1998 receipt is the only purported receipt plaintiffs identify as substantiation for charitable contributions claimed as a basis for refund in this action. (Doc. 58, ¶ 42.)

Arthur Andersen's 1998 tax records for William Cape include a copy of a Schedule K-1 from Cape & Sons for the 1998 calendar year; however, nothing confirms that it was a final or authentic K-1 issued by Cape & Sons to William Cape for that year. (Doc. 63, ¶ 10; Doc. 72, ¶ 10.) This purported K-1 shows pass-through charitable contributions of $4251 from Cape & Sons. (Doc. 63, ¶ 11; Doc. 72, ¶ 11.) Cape & Sons' 1998 tax return lists $9816 of deductible charitable contributions. (Doc. 63, ¶ 12; Doc. 72, ¶ 12.) The amount derived by multiplying the charitable contributions listed on Cape & Sons' 1998 tax return, $9816, by William Cape's ownership percentage for 1998, 43.306075%, is $4251. (Doc. 63, ¶ 13; Doc. 72, ¶ 13.)

Also, this purported K-1 shows $954,623 in negative items, including the above-stated amount of charitable contributions, $948,965 in ordinary loss from trade or business activities, and $1407 in net "section 1231 loss." (Doc. 63, ¶ 14; Doc. 72, ¶ 14.) These amounts were listed on lines 1, 2b, and 4 of the Form 6198 (At-Risk Limitations) included in William Cape's 1998 tax return. (Doc. 63, ¶ 15; Doc. 72, ¶ 14; Doc. 58, Ex. E at CAPEUSA000064.) The Form 6198 showed an adjusted basis of $734,561 in Cape & Sons and $54,328 of other income received from Cape & Sons during 1998. (Doc. 63, ¶ 16; Doc. 72, ¶ 16; Doc. 58, Ex. E at CAPEUSA000064.) Line 33 of William Cape's 1998

12

tax return reported a negative $520,764 as adjusted gross income. (Doc. 63, ¶ 23; Doc. 72, ¶ 23.)

The supporting materials for William Cape's 1998 tax return materials in Arthur Andersen's records include a copy of a purported Schedule K-1 from Curkeet to William Cape for the 1998 calendar year. (*See* Doc. 63, ¶ 45; Doc. 72, ¶ 45; Doc. 67, Ex. E.) However, it is unclear whether this was the final K-1 issued to William Cape. (*See* Doc. 72, ¶ 45; Doc. 67, Ex. E.) This purported Schedule K-1 lists $39,022 of loss from rental activities, which matches the corresponding number in William Cape's 1998 return. (Doc. 63, ¶ 46; Doc. 72, ¶ 46.)

As part of the 2003 audit, as shown on the 2003 Form 4549, the portion of the regular tax passive activity losses allowed in 1999, 2000, and 2001 for rental activities was not reduced or disallowed. (Doc. 63, ¶ 48; Doc. 72, ¶ 48.)

Statement 3 to William Cape's 1999 tax return reports $3,640 of "Contributions from K-1s." (Doc. 63, ¶ 19; Doc. 72, ¶ 19.) The purported William Cape Schedule K-1 for the 1999 tax year represents that $2902 of charitable contributions passed through to William Cape from Cape & Sons. (Doc. 63, ¶ 20; Doc. 72, ¶ 20; Doc. 67, Ex. F at CAPEUSA000908.)

William Cape's 2000 tax return claimed $7279 of deductions for charitable contributions on line 18. (Doc. 63, ¶ 27; Doc. 72, ¶ 27; Doc. 58, Ex. I at CAPEUSA000125.) Statement 4 to Schedule A of William Cape's 2000 tax return provided that $5269 of those contributions passed-through from Cape & Sons. (Doc. 63, ¶ 28; Doc. 72, ¶ 28; Doc. 58, Ex. I at CAPEUSA000156.) The same amount, $5269, is listed as charitable contributions on the Schedule K-1 for William Cape included with Cape & Sons'

13

2000 tax return.  (Doc. 63, ¶ 20; Doc. 72, ¶ 29; Doc. 67, Ex. G at CAPEUSA000968 (line 7).)  That amount, $5269, may be calculated by multiplying the charitable contributions listed on the Cape & Sons 2000 tax return, $12,099, by William Cape's ownership percentage of Cape & Sons, 43.551325%.  (Doc. 63, ¶ 30; Doc. 72, ¶ 30.)

William Cape's 2000 tax return reported adjusted gross income of $21,980 and a net operating loss carryover of $63,016.  (Doc. 63, ¶ 32; Doc. 72, ¶ 32; Doc. 58, Ex. I at CAPEUSA000120 (lines 21 and 33).)

William Cape's 2001 tax return reported adjusted gross income of $851,408 and a net operating loss carryover of $17,976.  (Doc. 92, ¶ 34; Doc. 58, Ex. N at CAPESA000001 (line 1.f.), CAPEUSA000014 (line E); *see* Doc. 63, ¶ 34.)  His 2001 Schedule C listed $600 of self-employment income.  (Doc. 63, ¶ 7; Doc. 72, ¶ 7.)  William Cape's tax records for 2001 contain a 1099-Misc from Johnson Bank stating that he received a $600 payment for his services as a director that year.  (Doc. 63, ¶ 6; Doc. 72, ¶ 6.)

Form 8582 for William Cape's 1996 tax return lists $47,537 of passive activity losses carried over from prior years (line 2d Cir.), $11,310 of passive losses for the 1996 calendar year (line 2b), and $2,748 of passive activity losses allowed as a deduction in 1996 (line 11).  (Doc. 63, ¶ 37; Doc. 72, ¶ 37; Doc. 58, Ex. A at BT0016.)

Purported Cape & Sons financial statements from 1998 and 1999 received by the attorney for William Cape's estate in probate proceedings from Cape & Sons indicate that Cape & Sons rented equipment from Curkeet.  (Doc. 66, ¶ 3, Ex. A at CAPE000462, ¶ 8.)  William Cape's 1997 to 2001 tax returns reported passive activity losses attributable to Curkeet or to "Curkeet Rental" and other passive losses attributable to equipment rental.

14

(Doc. 58, Ex. C at BT0287, Ex. E at CAPEUSA000073, Ex. F at CAPEUSA00011, Ex. I at CAPEUSA000157, Ex. K at CAPE000204-05; Doc. 63, ¶ 36; Doc. 72, ¶ 36.)

The following chart summarizes the regular tax passive activity losses reported on William Cape's 96–01 tax returns and associated forms and statements within the returns for activities identified as equipment rental and Curkeet rental.

| Regular Tax Passive Activity Losses | Curkeet Rental | Individual Rental | Total |
|---|---|---|---|
| Suspended losses carried over to 1996 Return | - | (47,537) | (47,537) |
| | | | |
| Losses incurred in 1996 | - | (11,310) | (11,310) |
| Losses deducted on 1996 Return | - | 2,748 | 2,748 |
| Losses suspended in 1996, to be carried over to 1997 Return | - | (56,099) | (56,099) |
| | | | |
| Losses incurred in 1997 | (52,893) | - | (52,893) |
| Losses deducted on 1997 Return | 3,943 | 4,183 | 8,126 |
| Losses suspended in 1997, to be carried over to 1998 Return | (48,950) | (51,916) | (100,866) |
| | | | |
| Losses incurred in 1998 | (39,022) | | (39,022) |
| Losses deducted on 1998 Return | 3,392 | 2,002 | 5,394 |
| Losses suspended in 1998, to be carried over to 1999 Return | (84,580) | (49,914) | (134,494) |
| | | | |
| Losses incurred in 1999 | (16,569) | - | (16,569) |
| Losses deducted on 1999 Return | 3,162 | 1,561 | 4,723 |
| Losses suspended in 1999, to be carried over to 2000 Return | (97,987) | (48,353) | (146,340) |
| | | | |
| Losses incurred in 2000 | (3,964) | - | (3,964) |
| Losses deducted on 2000 Return | 2,387 | 1,132 | 3,519 |
| Losses suspended in 2000, to be carried over to 2001 Return | (99,564) | (47,221) | (146,785) |
| | | | |
| Losses incurred in 2001 | (17,851) | - | (17,851) |
| Losses deducted on 2001 Return | 3,638 | 1,463 | 5,101 |
| Losses suspended in 2001, to be carried over to 2002 Return | (113,777) | (45,758) | (159,535) |

16

(Doc. 63, ¶ 38; Doc. 72, ¶ 38.)  No deduction for $159,535 of purported losses as shown in the bottom right cell of the above chart appears as a deduction on any of William Cape's tax returns.  (Doc. 63, ¶ 39; Doc. 72, ¶ 39.)

A Wisconsin tax depreciation schedule, obtained from the tax workpapers of Arthur Andersen lists $11,310 of depreciation for the 1996 calendar year.  (Doc. 58, ¶ 56.)  Cover letters from Arthur Andersen to William Cape from Arthur Andersen's records referenced a $56,099 regular tax passive activity loss carryover from 1996 to the 1997 calendar year; a $100,866 regular tax passive activity loss carryover from 1997 to the 1998 calendar year; a $146,340 regular tax passive activity loss carryover from 1999 to the 2000 calendar year; and a $159,535 regular tax passive activity loss carryover from 2001 to the 2002 calendar year.  (Doc. 58, ¶¶ 57-60; Doc. 63, ¶¶ 40-44; Doc. 72, ¶¶ 40-44.).)  These cover letters discuss the passive activity losses that correspond to the above chart.  (*See* Doc. 63, ¶¶ 40-44; Doc. 72, ¶¶ 40-44.)

The following chart shows the AMT passive activity losses reported on William Cape's AMT Forms 8582 and associated statements for the 96–01 returns, including the passive activity losses deducted each calendar year and the amounts disallowed each calendar year then carried over to the subsequent calendar year:

17

| Alternative Minimum Tax Passive Activity Losses | Curkeet Rental | Equipment Rental | Total |
|---|---|---|---|
| Suspended losses carried over to 1996 Return | | (24,159) | (24,159) |
| | | | |
| Losses incurred in 1996 | | (11,310) | (11,310) |
| Losses deducted on 1996 Return | | - | - |
| Losses suspended in 1996, to be carried over to 1997 Return | - | (35,469) | (35,469) |
| | | | |
| Losses incurred in 1997 | (38,768) | - | (38,768) |
| Losses allowed on 1997 Return | - | - | - |
| Losses suspended in 1997, to be carried over to 1998 Return | (38,768) | (35,469) | (74,237) |
| | | | |
| Losses incurred in 1998 | (38,364) | | (33,634) |
| Losses allowed on 1998 Return | 1,228 | 601 | 1,829 |
| Losses suspended in 1998, to be carried over to 1999 Return | (71,174) | (34,868) | (106,042) |
| | | | |
| Losses incurred in 1999 | (29,790) | (59,807) | (89,597) |
| Losses allowed on 1999 Return | 2,016 | 1,890 | 3,906 |
| Losses suspended in 1999, to be carried over to 2000 Return | (98,948) | (92,785) | (191,733) |
| | | | |
| Losses incurred in 2000 | (3,964) | - | (3,964) |
| Losses allowed on 2000 Return | 1,851 | 1,668 | 3,519 |
| Losses suspended in 2000, to be carried over to 2001 Return | (101,061) | (91,117) | (192,178) |
| | | | |
| Losses incurred in 2001 | (26,736) | - | (26,736) |
| Losses allowed on 2001 Return | 2,292 | 2,809 | 5,101 |
| Losses suspended in 2001, to be carried over to 2002 Return | (72,033) | (88,308) | (160,341) |

18

(Doc. 63, ¶ 49; Doc. 72, ¶ 49.)

The purported Schedule K-1 from Curkeet to William Cape in the Arthur Andersen files for the 1998 calendar year lists $39,022 of loss from rental activities and an AMT adjustment of $5388. (Doc. 67, Ex. E.) Subtracting the $5388 adjustment from the $39,022 rental loss leaves $33,634 for AMT passive activity loss, the sum reported on William Cape's 1998 tax return and shown in the chart above. (Doc. 63, ¶ 51; Doc. 72, ¶ 51.[3])

Plaintiffs are unable to determine William Cape's actual basis in Curkeet Services, Inc., for the tax years at issue in this action. (Doc. 60, ¶ 1.[4]) Curkeet's 1999, 2000, 2001 and 2002 tax returns reported that the amount paid for Curkeet's capital stock and paid in capital was $1,000. (Doc. 63, ¶ 54; Doc. 72, ¶ 54; Doc. 58, 62.) The 2001 income tax return for Curkeet reports, on Schedule M-2, that its accumulated adjustment account ("AAA") balance was equal to $90,292 as of December 31, 2001. (Doc. 58, 61; Doc. 63, ¶ 55; Doc. 72, ¶ 55.)

On or about October 31, 2003, Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return was filed for William Cape ("Form 706"). (Doc. 58, ¶ 63.) The Form 706 stated that the fair market value of the property received by the Estate from William Cape was $13,652. (Doc. 63, ¶ 53; Doc. 72, ¶ 53.) Schedule B of Form 706 listed the fair market value of William Cape's 50% interest in Curkeet as

---

[3]The proposed finding of fact states $32,634, but use of a calculator and reference to the chart indicates the number should be $33,634. The United States denies this proposed finding of fact, but the calculation, as corrected, appears accurate and the government's objection is not on point.

[4]The United States proposed this one statement of undisputed fact and the plaintiffs did not dispute it. (Doc. 68, ¶ 1.)

19

$13,652.  (Doc. 58, ¶ 65.)  No adjustment was made to the fair market value of William Cape's 50% interest in Curkeet as reported on Form 706.  (Doc. 58, ¶ 67.)

Cape & Sons was placed into receivership in Racine County, Wisconsin, on or about April 11, 2005.  (Doc. 58, ¶ 68.)  Curkeet's activities were related to the business activities of Cape & Sons, which served as the registered agent for Curkeet.  (Doc. 58, ¶ 69.)  Since 2006, Curkeet has been in delinquent status and on May 11. 2011, it was administratively dissolved.  (Doc. 58, ¶ 70.)

## DISCUSSION

Three alleged computational adjustments remain at issue in this case, described in the complaint as follows:  (1) the allowance of charitable contributions that were disallowed under the adjusted gross income limitation in calendar years 1998 and 2000 and are eligible to be carried over to years 1999 and 2001 under 26 U.S.C. § 170(d)(1)(A); (2) the use of itemized deduction and net operating loss deduction adjustments for the purpose of the AMT in years 1999, 2001, and 2002; and (3) the allowance of suspended passive losses upon William Cape's death in year 2002 under 26 U.S.C. § 469(g)(2).  (Doc. 1, ¶ 97(b), (d), (I); Docs. 55, 56.)  However, for practical purposes, these alleged computational adjustments are better organized chronologically and by particular items for discussion:  (1) alleged personal and pass-through charitable contributions in 1998, which were suspended as deductions because of tax code limitations for that year but were eligible and should have been taken in 1999; (2) alleged personal and pass-through charitable contributions in 2000, which were suspended as deductions in that year but were eligible and should have been taken in 2001; and (3) alleged passive activity losses attributable to Curkeet's rental of items to Cape & Sons and other equipment rental activity,

20

which were suspended as deductions from 1996 to 2001 but were eligible and should have been taken in 2002 upon William Cape's death. (*See* Doc. 62 at 4-17.) Plaintiffs submit that these adjustments entitle them to a refund of $56,800. (Doc. 74 at 2 n.2.)

In an action for a tax refund, the taxpayer must show by a preponderance of the evidence that he is entitled to the claimed refund. *United States v. Janis*, 428 U.S. 433, 440 (1976); *Sherwin-Williams Co. v. United States*, 403 F.3d 793, 796 (6th Cir. 2005). The IRS's determination of the tax owed is presumed correct; the taxpayer bears the burden of proving that the IRS's assessment of taxes was wrong and the amount he should recover. *Janis*, 428 U.S. at 440; *Sherwin-Williams*, 403 F.3d at 796; *Mays v. United States*, 763 F.2d 1295, 1297 (11th Cir. 1985). The presumption disappears when "credible evidence" or "substantial evidence" is introduced to overcome it, showing deductibility. 26 U.S.C. § 7491(a)(1); *KFOX, Inc. v. United States*, 510 F.2d 1365, 1369 (Ct. Cl. 1975); *Ky. Tr. Co. v. Glenn*, 217 F.2d 462, 465 (6th Cir. 1954). "Credible evidence" is the "quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness." *Rigas v. United States*, No. H-09-3770, 2011 WL 1655579, *4 (S.D. Tex. May 2, 2011) (internal quotation marks omitted); *In re Indus. Commercial Elec., Inc.*, 319 B.R. 35, 55 (D. Mass. 2005).

"Once the taxpayer has met this burden the presumption disappears and the court must resolve the question upon the basis of all of the evidence before it." *KFOX*, 510 F.2d at 1369. Overcoming the presumption results in the burden of proof shifting to the IRS. *See* 26 U.S.C. § 7491(a)(1). However, the burden shifts only if the taxpayer has complied with the requirements to substantiate any item, has maintained all records as required, and

21

has cooperated with reasonable requests by the IRS for information and documentation. § 7491(a)(2). "What a taxpayer needs to substantiate his deductions and losses are records sufficient to permit verification of a deduction or loss." *Baker v. Comm'r of Internal Revenue*, T.C. Memo. 2008-247, 2008 WL 4756651, *4 (U.S. Tax Ct. Oct. 30, 2008). Under 26 U.S.C. § 6001, every person liable for federal taxes "shall keep such records . . . as the [IRS] may from time to time prescribe."

The plaintiffs allege that their computational claims "flow[] automatically from the proper application" of the tax code. (Doc. 1, ¶ 31.) They say that the refunds are substantiated by tax returns, K-1s, and the Harmsen declaration.

A.     The Charitable Deductions

Charitable deductions are allowable "only if verified under regulations prescribed by the Secretary." 26 U.S.C. § 170(a)(1). A taxpayer making a charitable contribution must maintain for each contribution a canceled check, a receipt from the donee, or "other reliable written records showing the name of the donee, the date of the contribution, and the amount of the contribution." 26 C.F.R. § 1.170A-13(a)(1). The reliability of any other written record is determined on the basis of all facts and circumstances of a particular case, and the taxpayer bears the burden of establishing reliability. 26 C.F.R. § 1.170A-13(a)(2). Factors to consider include the contemporaneous nature of the writing and the regularity of the taxpayer's record-keeping procedures. *Id.* Moreover, "[n]o deduction shall be allowed . . . for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgment of the contribution by the donee organization that" includes the amount of cash (or description of property) contributed, whether the donee organization provided any goods or services in

22

consideration for the donation, and a description and good faith estimate of the value of any goods or services donated. 26 U.S.C. § 170(f)(8)(A), (B), (E). An acknowledgment is contemporaneous if obtained by the date on which the taxpayer files the return for the tax year in which the contribution was made or the due date for filing such a return. § 170(f)(8)(C).

If an S corporation makes a contribution of $250 or more, the entity must substantiate the contribution with a contemporaneous acknowledgment and maintain that acknowledgment in its records. A shareholder, even if his share of the gift is $250 or more, is not required to obtain any additional substantiation for his share of the contribution. 26 C.F.R. § 1.170A-13(F)(15); Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates & Gifts* ¶ 35.5.6, at S35-43 (Supp. 2012).

1.    The Alleged 1998 Deduction/1999 Carryover

William Cape's 1998 tax return showed $5326 of deductible charitable contributions. Arthur Andersen's records for William Cape include the "IRS Tax Receipt" stating that William Cape made $1075 in charitable donations during 1998 to St. Luke's Episcopal Church and that no goods or services were provided in exchange for the gifts. A purported 1998 K-1 from Cape & Sons to William Cape from Arthur Andersen's files showed $4251 in pass-through charitable donations allocated to William Cape, and that amount matches the amount of charitable contributions on Cape & Sons' 1998 return multiplied by William Cape's ownership percentage.

As argued by plaintiffs, because of certain limitations on deductions for contributions, the deduction could not be taken in 1998 but could be carried over to 1999. However, William Cape took only $738 of the amount as a deduction in 1999. (*See* Doc.

23

62 at 6-7.)  Plaintiff's argue that the remainder of the 1998 charitable deductions, $4588, should have been deducted in the 1999 year after the 2003 audit adjustment occurred.  (*Id.* at 7-8.)

Plaintiffs have not presented credible evidence of their right to refund on this basis. Moreover, the evidence before this court indicates a lack of substantiation by Cape & Sons for the deduction.  Tax returns and K-1s are not evidence of the truth of the numbers stated in them.  *Sparkman v. Comm'r of Internal Revenue*, 509 F.3d 1149, 1157-58 (9th Cir. 2007); *Baker*, 2008 WL 4756651, *3-*4*; see Mays*, 763 F.2d at 1297 ("The claim must be substantiated by something other than tax returns.").  As stated by the *Baker* tax court,

> We finish our consideration by citing our long series of precedents in which we have held that a taxpayer's returns do not substantiate deductions or losses because they are nothing more than a statement of his claims.  To hold otherwise would undermine our presumption that the Commissioner's determination is correct.  For the same reason, we long ago established that under circumstances like these, a taxpayer can't undermine the rule that old returns are not substantiation of deductions or losses by adding to them the bare testimony that those old returns are correct, without records or credible testimony about the individual items on the returns. . . .
>
> Much the same rules apply to the K-1s that Baker offered to substantiate the deductions from his pass through businesses; they, too, are only statements of his claims, not proof of them.

2008 WL 4756651, at *3-*4 (citations omitted).  The Massachusetts district court in *In re Industrial Commercial Electric* noted that

> [i]f Congress had wished to make offer of relevant tax returns—or testimony that the relevant tax returns are accurate—sufficient to meet the "credible evidence" requirement, presumably that intent would have manifested itself in the language of the statute or in the legislative history, given that tax returns and testimony as to their validity would likely appear in virtually every case under Section 7491. There is no such indication in either place, however. Thus, to meet the "credible evidence" standard, a taxpayer must present other evidence, such as business records, building deeds, testimony by customers or business partners, and so on.

24

319 B.R. at 55.

Plaintiffs contend that they should not face an impossible burden to substantiate the content of the tax returns in this case and that the court should accept the content of those tax returns as true. But the cases they cite do not go as far as plaintiffs wish. For instance, *Zeeman v. United States*, 275 F. Supp. 235 (S.D.N.Y. 1967), addressed the use of tax returns to meet a plaintiff's initial burden to overcome the presumption, but the court noted that accepting the returns was expedient as a means of limiting the issues to be litigated, but "with an evidentiary foundation laid through a competent witness." *Id.* at 256. Without a foundation as to the correctness of the return, "standing by itself, the return is merely self-serving hearsay if offered on behalf of the taxpayer." *Id.* at 256 n.8. The court indicated that an evidentiary foundation could be made by "a qualified accountant who prepared the return and was familiar with the taxpayer's books and records and sources of income, where the books and records were available in court as a basis for cross-examination." *Id.*

Here, plaintiffs have failed to provide such an evidentiary foundation. Harmsen has set forth no familiarity with William Cape's or Cape & Sons' books and records and has not said that he prepared the returns. Similarly, *Rigas* required more than simply the tax returns or K-1s as evidence. There, the taxpayers sought to claim as capital gains a distribution one entity received from another, and the determination turned on whether the two entites were in a partnership. 2011 WL 1655579 at *4. Although the court found that tax returns and K-1s supported the capital gains treatment, those documents were accompanied by deposition testimony and agreements that supported the treatment as partners. That verification constituted credible evidence to rebut the presumption of

25

correctness.  *Id.*  Moreover, as noted by the court, the taxpayers complied with substantiation requirements by retaining not only the relevant tax returns and K-1s but also "the relevant correspondence with the IRS, underlying documentation of the assets held by [one of the companies], and the relevant agreements."  *Id.* at *5.  *Rigas* does not stand for the proposition that tax returns and K-1s alone, without the underlying documentation, would suffice as credible evidence or compliance with substantiation requirements.

While William Cape did not need *additional* substantiation to take the pass-through deduction, that did not excuse the S corporation, him, or his estate and widow from presenting the S corporation's substantiation for the deductions.  *Someone* needed to substantiate the deduction with the IRS.  And the refusal of the IRS to adjust partially taken charitable deductions during the 2003 audit does not eliminate plaintiffs' obligation to substantiate the deductions when they seek a refund.  *See Brown v. United States*, 890 F.2d 1329, 1347 (5th Cir. 1989) (rejecting taxpayer's argument that the IRS's failure to require changes in a previous audit estopped the United States from correcting its error in later litigation).

The receipt from St. Luke's church gives the court slightly more pause, because as part of William Cape's files at Arthur Andersen it likely came from William Cape.  But it does not meet the requirements of Fed. R. Evid. 803(6)(C) because the record was not made by Arthur Andersen and it does not meet the requirements of Rule 803(6)(A) because no information indicates when and by whom the record was made.  The document does not qualify for the residual exception of Fed. R. Civ. P. 807 because Rule 803(6) addresses such a document.  *Schimpf v. Gerald, Inc.*, 52 F. Supp. 2d 976, 984 (E.D. Wis. 1999) (Adelman, J.).  Though evidentiary standards may differ from

26

substantiation requirements before the IRS, nothing indicates that this receipt was contemporaneous to the date of the donation or verifies that it came from the church.

Plaintiffs argue that the substantiation rules should be relaxed in this case because Cape & Sons was taken over by a receiver and is defunct, Curkeet was dissolved, Arthur Andersen no longer exists, and William Cape is dead. However, this confluence of bad events for recordkeeping does not mean the IRS should adjust its substantiation requirements. Moreover, though the court does not base its decision on this point, plaintiffs do not explain why they fail to possess William Cape's personal charitable donation records. They say that "there is no indication that either Mr. Cape or the Estate and its beneficiaries did not adequately maintain records." (Doc. 74 at 11.) But where are those records now, then? The unfortunate demise of the Cape & Sons business or Arthur Andersen cannot be considered the cause for the Estate's or Feldman's own lack of records regarding William Capes personal charitable donations, for which plaintiffs now wish to recover a refund. The "heavy burden of proof in tax refund cases is justified by the strong need of the government to accomplish swift collection of revenues and encourage record keeping by taxpayers." *Richmond v. United States*, 699 F. Supp. 578, 584 (E.D. La. 1988).

For these reasons, plaintiffs' claim for the $4588 carryover in 1999 is denied.

2.      The Alleged 2000 Deduction/2001 Carryover

William Cape's 2000 return reflected $7279 of deductions for charitable contributions. Statement 4 to Schedule A of that return provided that $5269 of those contributions were passed-through from Cape & Sons, and that amount matches the amount of charitable contributions listed on Cape & Sons' 2000 tax return multiplied by

27

William Cape's ownership percentage. According to plaintiffs, because after the 2003 audit William Cape's contribution base for 2000 was negative, following his 2003 audit and that the $7279 was suspended for 2000. Consequently, plaintiffs submit that it was available to be carried over and deducted in 2001. (Doc. 62 at 8-9.) Plaintiffs contend that an IRS appeals officer acknowledged this deductibility by reviewing the refund claim and writing that the carryover of $7279 should be allowed. (Doc. 62 at 9.)

Similar to the 1998 pass-through charitable deduction, the 2000 pass-through charitable deduction is not substantiated by any documentation from Cape & Sons. Again, although William Cape did not need to provide additional substantiation, that does not excuse the S corporation's failure to substantiate the deduction. For the same reasons as stated above regarding the 1998 alleged deduction, plaintiffs have failed to substantiate the pass-through deduction.

As for any personal charitable contribution, plaintiffs admit that the available records from Arthur Andersen do not contain receipts for $1300 of the charitable contributions made by William Cape in 2000. (Doc. 62 at 21.) They argue that "the direct correspondence between the records that are available and the numbers reflected on William Cape's tax return clearly suggests that these other numbers reflected on his return are accurate and reliable also." (*Id.*) Citing to *Cohan v. Commissioner of Internal Revenue,* 39 F.2d 540, 544 (2d Cir. 1930), they contend that a "taxpayer is not denied relief altogether merely because he lacks the best possible evidence." (*Id.*)

*Cohan* does not aid the plaintiffs here. *Cohan* involved a court finding that the taxpayer had spent a significant amount on allowable business expenses, but the taxpayer had not kept track of the amounts and provided only an estimate. 39 F.2d at 543-44. The

28

Second Circuit held that when the taxpayer established an allowable deduction but not the exact amount, an approximation was permitted:

> Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent.

*Id. Cohan* does not provide support for allowing approximation regarding whether an allowable deduction has occurred or been substantiated in the first place. *See Oates v. Comm'r of Internal Revenue*, 316 F.2d 56, 59 (8th Cir. 1963) ("We believe that considerable discretion exists in the application of the *Cohan* rule, and that such rule should be applied only in cases where the taxpayer has clearly shown that he is entitled to some deduction and that uncertainty exists only as to the exact amount thereof.").

The IRS appeals officer's note is not evidence substantiating these charitable deductions. That officer's opinion did not sway the IRS in its final denial of the plaintiffs' appeal. One IRS appeal officer's belief that the plaintiffs' refund claim had some merit does not suffice as substantiation of an allowable deduction, not does it overcome the presumption that a prior IRS determination that the amount was not deductible was correct.

For these reasons, the plaintiffs' claim for $7279 in carryover for 2001 is denied.

B.     Passive Activity Losses

Plaintiffs further contend that whether calculated under regular tax rules or under the alternative minimum tax rules, about $159,000 to $160,000 in passive activity losses accrued for William Cape by the end of 2001 and should have been deductible upon his death in 2002. (Doc. 62 at 9-17.)

29

Title 26 U.S.C. §§ 465 and 469 were passed as part of Congress's attempt to limit tax shelters. 1 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates & Gifts* ¶ 28.1, at 28-2 (3d ed. 1999). Certain tax shelters operated by offsetting salaries and business income of all types with deductions from rapid depreciation of equipment. *Id.* at 28-3. Under § 465, taxpayers who finance investments with nonrecourse loans may take deductions only against income from that investment. *Id.* at 28-5. And under § 469, which is not limited to financed activities, "losses from passive activities may only be deducted from income from other passive activities." *Id.* at 28-5. Generally, a passive activity is an investment in which the investor is not an active participant; a "limited partnership interest in an equipment leasing partnership is a typical example." *Id.* at 28-6.

> Section 469 essentially creates a basket containing all of a taxpayer's investments from passive activities and isolates losses and credits within the basket from other income. Losses from one passive activity can be deducted against income from other passive activities, but a net loss from all passive activities may not be deducted against other income.

*Id.* at 28-7. However, § 469 does not disallow the passive losses permanently; instead, the usual effect is to suspend the losses until another year. *Id.* at 28-8. "A loss or credit made nondeductible by § 469 is carried forward to succeeding years until it is allowed." *Id.* And, usually, suspended losses can be deductible against all income when the taxpayer's entire interest in the passive activity is sold or exchanged. *Id.* Section 469(g)(2) provides that if an interest in an activity "is transferred by reason of the death of the taxpayer" previously suspended passive losses become deductible on the decedent's final return to the extent greater than any step-up in basis for the estate. 26 U.S.C. § 469(g)(2).

Plaintiffs acknowledge that the available records from Arthur Andersen do not contain William Cape's records for years prior to 1996. (Doc. 62 at 21.) Again, they argue

30

that "the direct correspondence between the records that are available and the numbers reflected on William Cape's tax return clearly suggests that these other numbers reflected on his return are accurate and reliable also" and cite *Cohan*. (*Id.*)

That amounts on tax returns and K-1s match does not mean that the facts underlying those amounts are reliable or have been substantiated. Plaintiffs rely on tax returns, K-1s, and documents from accountants' files for the calculations in the tables above regarding passive activity losses and carryovers, as well as the value of William Cape's interest in Curkeet. They attempt to show that these documents are reliable by pointing to consistencies, that numbers discussed in letters from Arthur Andersen match passive activity loss numbers on the tax forms, that the amount in a 1099-Misc from Johnson Bank matches self-employment income listed by William Cape and that amounts on an S corporation's tax returns corresponded with what William Cape reported as his ownership percentage. (*See* Doc. 62 at 4, 11-12, 19.) But the fact that amounts are reported consistently in various documents prepared by the same accountants does not make them more reliable. The information behind the numbers in the tax returns and K-1s (assuming that the K-1s are true copies of the final versions, which is unknown) still must be substantiated. That the plaintiffs' ability to obtain records confirming the bases for their refund claims is difficult does not support a judicial finding that IRS rules should be relaxed to allow the refund sought in this case.

This court agrees with cases stating that such tax returns and K-1s alone do not substantiate a refund claim or constitute credible evidence. And again, *Cohan*'s holding permitting approximation of the amount of an otherwise substantiated deduction does not aid the plaintiffs here, where an allowable deduction has not been substantiated in the first

31

place. Thus, plaintiffs have failed to meet their burden or proof for a refund; they have not overcome the presumption that the taxes at issue were determined correctly.

Moreover, there are other obstacles to accepting related tax returns and K-1s of other taxpayers or entities as substantiation. Importantly, the accuracy of those tax returns and K-1s is drawn into question by the results of the 2003 audit, which adjusted William Cape and Feldman's tax liability thereby requiring them to pay *more* in taxes than they had under the challenged tax returns as filed initially. The plaintiffs' previous pass-through claims representing that Cape & Sons overstated its income in its tax returns (*see* Doc. 1, ¶ 39) also suggests that the filed tax returns and final K-1s were not accurate. The court notes that plaintiffs maintain that the financial statements of Cape & Sons and Curkeet overstated income but now want the court to accept their financial records as reliable.

Further, even if the tax returns and K-1s were considered, nothing provided by plaintiffs shows what exactly the vague "individual rental activity" or "equipment rental activity" including Curkeet that is referenced in the documents (and the tables above) consisted of such that passive activity losses could be confirmed. Plaintiffs provide no information showing that rental activities occured, what Curkeet's alleged rental activities entailed, and what the "individual rental activity" comprised. Nothing verifies passive activity losses carried over to 1996 from prior years. Because plaintiffs offer no information regarding the nature of Curkeet's purported rental business, nothing supports a finding that the rental activity was passive in nature, whether actual losses were incurred, and whether the returns properly represented the tax effects of the purported rental activities through the years.

32

Also, plaintiffs concede that records substantiating William Cape's basis in Curkeet are not available, yet contend that his basis can be determined from capital stock and accumulated adjustment account (AAA) numbers on his tax returns. (Doc. 62 at 15-16.) They admit that other items could affect William Cape's basis, but say "there are no facts (disputed or undisputed) to suggest the presence of any such items." (Doc. 62 at 15 n.13.) This argument points again to the lack of evidence supporting plaintiffs' refund claims. The burden is on plaintiffs to show entitlement to a refund; a lack of evidence indicates that they do not meet their burden.

CONCLUSION

In summary, the plaintiffs have not met their burden of proof in this tax refund case. They argue that they have met their initial burden because nothing suggests that the information on their tax returns and forms is incorrect, and contend that the United States "cannot prove by a preponderance of evidence that Plaintiffs are *not* entitled to the Deductions." (Doc. 74 at 3.) But the plaintiffs have failed to satisfy their initial burden of proof. No burden shift occurred, and plaintiffs have not provided evidence on which a reasonable fact-finder could rely to find in their favor.

In their brief, plaintiffs cite the "unfortunate unavailability" of additional records to support their claim. (Doc. 62 at 1.) They contend that in such situations a taxpayer should be given flexibility to meet IRS substantiation requirements (*see* Doc. 74 at 4) and that their substitute evidence of tax returns, tax forms, and vague statements by an employee of their former accountant should be accepted as support for their refund claims. But the plaintiffs' inability to substantiate their claimed refunds does not provide a legal ground circumventing the IRS's substantiation rules.

33

For the reasons set forth above, the government's motion for summary judgment (Doc. 70) has been granted and plaintiffs' motion for summary judgment (Doc. 61) has been denied.

IT IS ORDERED that the case is dismissed.

Dated at Milwaukee, Wisconsin, this 2nd day of October, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE